**Glenn S. Bacal** (AZ Bar No. 006812)
E-mail: glenn.bacal@bacalgroup.com
**Sean D. Garrison** (AZ Bar No. 014436)
E-mail: sean.garrison@bacalgroup.com
Direct Dial: 480-719-8501
**BACAL LAW GROUP, P.C., DBA**
**BACAL & GARRISON LAW GROUP**
6991 East Camelback Road, Suite D-102
Scottsdale, Arizona  85251
Fax: (480) 245-6231

*Attorneys for Plaintiff Arizona Board of Regents,*
*for and on behalf of Arizona State University*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Board of Regents, a body corporate, for and on behalf of Arizona State University,<br><br>Plaintiff,<br><br>v.<br><br>John Doe aka "asu_covid.parties," an individual, et al.<br><br>Defendants. | Case No. 2:20-CV-01638-DWL<br><br>**PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT** |

The Clerk has entered the default of defendant John Doe aka "asu_covid.parties" ("Defendant").  *See* Doc# 31.   Pursuant to Fed. R. Civ. P. 55(b)(2), Plaintiff Arizona Board of Regents, a body corporate, for and on behalf of Arizona State University, ("ASU") moves for the entry of a default judgment and permanent injunction against enjoining Defendant from using and/or diluting the ASU Marks and the maroon and gold school colors trade dress, making false statements about ASU, and targeting ASU students for so-called COVID parties, as set forth in the proposed Default Judgment and Permanent Injunction submitted herewith.  ASU limits its requested remedies to this injunctive relief and does not seek the imposition of any monetary damages against Defendant.

**MEMORANDUM IN SUPPORT**

**A. Because the Court has both jurisdiction over the subject matter and personal jurisdiction over the Defendant, it has the authority to grant a default judgment.**

A court has authority to render judgment in an action when the court has jurisdiction of the subject matter of the action and the party against whom judgment is to be rendered has submitted to the jurisdiction of the court. *Restatement (Second) of Judgments* § 1 (1982); *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999) ("To avoid entering a default judgment that can later be successfully attacked as void, a court should determine whether it has the power, i.e., the jurisdiction, to enter the judgment in the first place.") Because this case is before the Court on a federal question, subject matter jurisdiction exists.

In its December 17, 2020 Order (Doc# 30), the Court found, among other things, that "Defendant John Doe has voluntarily appeared in this action, making formal service of process unnecessary under the circumstances." *See also Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir. 1982) ("Jurisdiction attaches if a defendant makes a voluntary general appearance, as by filing an answer"); *Thomas v. Fed. Home Loan Mortg. Corp.*, 2010 WL 11595170, at *1 (D. Nev. May 12, 2010) ("The voluntary appearance in a matter waives the requirement for personal service"). Accordingly, personal jurisdiction exists by virtue of Defendant's voluntary appearance.

Once jurisdiction has attached, the Court has discretion to enter a default judgment in the appropriate circumstances – even against Doe defendants. *See, e.g., Chen Lunxi v. Doe,* 2020 WL 2026333 (E.D. Va. Mar. 27, 2020), *report and recommendation adopted at* 2020 WL 1984720 (entering default judgment against Doe defendant); *Malibu Media, LLC v. Doe*, 2020 WL 134112 (E. D. Mich. Jan. 13, 2020) (same); *Wilens v. Doe Defendant No. 1,* 2015 WL 4606238 (N.D. Cal. Jul. 15, 2015), *report and recommendation adopted at* 2015 WL 5542529 (N.D. Cal. Sept. 18, 2015) (same); *Joe Hand Promotions, Inc. v. Rivera*, 2002 WL 1677699 (W.D.N.Y. Jul 11, 2002) (same).

**B.  The *Eitel* factors support the entry of a default judgment.**

In exercising its discretion to award default judgment, the Court may consider the following factors:  (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.  *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

Here, the *Eitel* factors warrant the entry of a default judgment in this case.

1.  *Eitel* Factor 1 - Prejudice

The first factor, prejudice to ASU, weighs heavily in favor of granting default judgment.  If ASU's motion is not granted, ASU will have no other recourse for recovery.  *See PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).  This is especially so here, where Defendant has deliberately masked their true identity, by using fake registration data for its Instagram accounts and an anonymous e-mail address, and by refusing to comply with the Court's August 27, 2020 Order to file a reasoned motion to proceed anonymously if Defendant wanted to remain anonymous.  *See Mode Media Corporation v. Doe 1*, 2016 WL 9211683, *2 (N.D. Cal. Sept. 12, 2016) (noting that the plaintiff "would be prejudiced by a denial of its motion because Defendant's concealed identity and refusal to participate in these proceedings otherwise prevents [plaintiff] from obtaining relief.")

2.  *Eitel* Factors 2 and 3 – Merits and Sufficiency of the Complaint

The second and third *Eitel* factors – namely, the merits of the claims and sufficiency of the complaint – are often considered together.  In addressing these factors, "[t]he district court is not required to make detailed findings of fact."  *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).  All "well-pled allegations in the complaint regarding liability

are deemed true." *Id*.  Furthermore, in this case, ASU submitted a Verified Complaint (Doc# 1) to substantiate its factual allegations.  *See SATA GmbH & Co. KG v. Taizhou Xingye Pneumatic Tools Co.*, 2021 WL 624606, at *2 (D. Nev. Jan. 27, 2021), report and recommendation adopted, 2021 WL 619752 (D. Nev. Feb. 16, 2021) (concluding that "a detailed, verified complaint describing Defendant's unlawful conduct" supports a default judgment).

ASU seeks a default judgment against Defendant on 4 counts:  Count One -Federal Trademark Infringement; Count Two – False Designation of Origin and False Advertising; Count Four – Trademark Dilution under A.R.S. 44-1448.01; and Count Five – Unfair Competition.  ASU first addresses the material facts, which are deemed to be true in light of Defendant's default, and then the application of those facts to the claims.

## MATERIAL FACTS

ASU is the State of Arizona's largest university, with its largest campus located in Tempe, Arizona. (Verified Complaint, ¶1).  Founded in 1885, ASU became known as Arizona State University in 1958 and has continuously operated under the ASU and ARIZONA STATE UNIVERSITY trademarks ever since then.  (Ver. Comp., ¶9)  These trademarks are federally registered for a variety of different goods and services, including but not limited to providing entertainment events. (Ver. Comp., ¶10 and Exhibit 1)  The federal registrations for the ASU Marks have become incontestable, which constitutes conclusive proof of ASU's ownership and exclusive right to use the ASU Marks.  (Id.; 15 U.S.C. §1115(b).  ASU also owns trade dress rights in its maroon and gold school colors, which it has been using extensively since at least as early as 1898.  (Ver. Comp., ¶ 11).

ASU is one of the largest universities in the country, with more than 48,600 students having applied as incoming first-year students to ASU for the fall 2019 semester.  (Ver. Comp., ¶14) ASU accepted 85% of student applicants in fall 2019 and welcomed its largest ever class of 13,168 first year students. (Id.) In total, almost 120,000 students enrolled at

ASU in the fall of 2019.  (Id.) Total enrollment has continued to increase year over year, exceeding 100,000 students each year since the fall of 2017. (Id.)

ASU has received numerous and prestigious honors.  U.S. News & World Report rates 98 undergraduate and graduate programs at ASU among the top 50 in the country, including 64 programs in the top 25 and 22 programs in the top 10.  (Ver. Comp., ¶ 15) ASU has now held the No. 1 ranking for innovation five years in a row.  (Id.)

ASU is one of Arizona's largest employers with more than 17,000 employees.  (Ver. Comp., ¶16)  In 2018, approximately 250,000 ASU graduates worked in Arizona.  (Ver. Comp., ¶17)  In Fiscal Year 2019, the university generated an economic impact of nearly $4 billion on the state's gross product and 49,278 jobs.  (Ver. Comp., ¶18)

At the close of its 2019 fiscal year, more than 101,500 individual, corporate and foundation supporters had donated to ASU.  (Ver. Comp., ¶ 19)  ASU received a record-breaking $413.7 million in philanthropic support from these donors throughout Arizona and the world in 2019 for its academic programs, research and initiatives.  (Id.)

ASU has a rich athletic tradition, and the ASU Marks are used prominently to identify the athletics program.  ASU's teams and individual student athletes have won hundreds of national titles, and ASU was named the No. 1 college athletic program by Sports Illlustrated for 2007-2008.  (Ver. Comp., ¶ 20).

ASU plans, holds, sponsors, and promotes numerous events each year on its campuses and within the surrounding communities, including but not limited to events for incoming and returning students.  (Ver. Comp., ¶ 21)  ASU regularly maintains an events page on its website (https://asuevents.asu.edu/) to promote certain of these events.  (Ver. Comp., ¶ 22) In the Covid-19 environment, as students were returning to campus for the Fall semester 2020, all events not directly related to the educational or research mission of the university were canceled. (Id.)

ASU receives extensive unsolicited media coverage and invests substantial sums in

advertising and promoting its educational programs, services, athletic programs and sponsored events to students, prospective students, alumni and the general public under the ASU Marks and trade dress. (Ver. Comp., ¶ 12)

As a result of this longstanding use, exposure and promotion of the ASU Marks, these marks and trade dress have become famous in Arizona and extremely well known and well regarded throughout the United States and the world. (Ver. Comp., ¶ 13)

<u>The "asu_covid.parties" infringement</u>

On or about July 19, 2020, Defendant created an Instagram account with the username "asu_covid.parties" and posted the following message:



In addition to using the ASU mark as the first part of the account username "asu_covid.parties," Defendant included the ARIZONA STATE UNIVERSITY mark immediately below the username on the post (circled above), an ASU logo within the body of the message, and formatted the post in ASU's maroon and gold school color trade dress. As posted, the message falsely appears to originate from ASU or an account associated with ASU. (Ver. Comp., ¶ 23).

The username and account profile misleadingly suggested that this account is associated with ASU, even though it is not.  The profile name is "ASU Coronavirus Parties"

and the owner categorizes itself as an "Event Planner" "THROWING HUGE PARTIES AT ASU," which reflects its commercial nature.  (Ver. Comp., ¶ 24)



On or about July 20, 2020, the account began promoting "our first party" which it named "Hoax-19," and claiming "COVID-19 is a fat hoax," as depicted in the 2 posts below:



(Ver. Comp., ¶ 25-26)

Thereafter, "asu_covid.parties" posted another message, again including the ARIZONA STATE UNIVERSITY mark immediately below the username (circled below) and claiming that "We have partnered with an Israeli company to distribute hydrochloroquine! All Profits of the party will go to helping people in other countries get hydrochloroquine to treat COVID-19!"  A true and correct copy of this post, which indicates the commercial nature of the advertised "Hoax-19" party and falsely asserts a partnership between ASU or an ASU related entity and an Israeli company identified in the comments as Teva Pharmaceuticals (circled below) to distribute hydrochloroquine, a highly controversial drug, appears below:



(Ver. Comp., ¶ 27)

Other posts by "asu_covid.parties" discourage wearing masks, which directly contradicts, undermines, and interferes with the actual health related message, consistent with the local law that mandates wearing of masks at this time, that ASU was attempting to provide to its students and the community.  (Ver. Comp., ¶ 28)

As a function of the Instagram platform, every Instagram post may be viewed not only by those who follow the account on which the post has first been published, but every post also can be shared (and thus further distributed) by anyone through a variety of means, including without limitation, by a sending a direct message to another user on Instagram, by sharing it to a Facebook account, by sending it via Facebook messenger, by tweeting the post on Twitter, by sending the post via an e-mail message, and by copying and pasting a hyperlink to the post in any other medium.  (Ver. Comp., ¶ 29).  As a result, each individual post is likely to be viewed separately and not within the context of the full Instagram account.

Defendant's unauthorized use of the ASU Marks in social media usernames, profiles and posts is likely to cause confusion as to whether ASU is affiliated with, endorses, and/or sponsors these accounts, their messaging that could result in dangerous public health

consequences if followed by others, and the "Hoax-19" covid party that was being promoted through this account. (Ver. Comp., ¶ 30)

<u>"asu_covid.parties" False and Offensive Statements About ASU</u>

In addition to the instances of infringement of the ASU Marks, Defendant has engaged in a series of offensive and false statements about ASU. The account has posted objectively false statements and information about ASU, including, for example, the following post in which it claims that the account owner has "won the battle in court" and that ASU has been ordered to pay its legal fees plus $500,000 in damages. (Ver. Comp., ¶ 33) No such lawsuit or claim for damages exists. (Ver. Comp., ¶ 34) If that were not enough, in several posts the owner of this account portrays ASU and its leadership as Nazis, referring to ASU's President Crow as Fuhrer Crow and comparing ASU's mask requirement to forcing Jews to wear a yellow Star of David. (Ver. Comp., ¶ 35) These false and offensive posts appear to be calculated to injure ASU's reputation and the goodwill associated with the famous ASU Marks. (Ver. Comp., ¶ 36).

<u>ASU's Asserted Claims in the Verified Complaint</u>

<u>A.   Counts One, Two, and Five - Federal Trademark Infringement, False Designation of Origin, and State Unfair Competition.</u>

A claim for trademark infringement requires only two elements: (1) ownership of a trademark and (2) a likelihood of confusion caused by the defendant. *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072 (9th Cir. 2014), as amended (Mar. 11, 2014). A claim for false designation of origin under 15 U.S.C. § 1125(a) requires proof of the same elements as a claim for trademark infringement under 15 U.S.C. § 1114. *See Monster Energy Co. v. BeastUp LLC*, 395 F. Supp. 3d 1334, 1349–50 (E.D. Cal. 2019) (citing *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 n. 6 (9th Cir. 1999). Unfair competition under Arizona law is also premised on a likelihood of confusion and is deemed to exist when federal trademark

infringement or false designation of origin has been shown. *See IOW, LLC v. Breus*, 425 F. Supp. 3d 1175, 1195 (D. Ariz. 2019).

Because they are incontestable, the federal registrations of the ASU Marks are conclusive evidence of ASU's ownership and exclusive right to use the ASU Marks. 15 U.S.C. § 1115(b). These registrations became incontestable long before Defendant's creation of the "asu_covid.parties" Instagram account in July of 2020. Furthermore, university school colors constitute protectable trade dress. *See Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008) ("By associating the color and other indicia with the university, the fans perceive the university as the source or sponsor of the goods because they want to associate with that source.") Thus, the first element has been established.

In the Ninth Circuit, likelihood of confusion is evaluated using the following factors: (1) strength of the protected mark; (2) proximity and relatedness of the goods; (3) type of goods and the degree of consumer care; (4) similarity of the protected mark and the allegedly infringing mark; (5) marketing channel convergence; (6) evidence of actual consumer confusion; (7) defendant's intent in selecting the allegedly infringing mark; and (8) likelihood of product expansion. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014). Not all factors are relevant in every case. "Because the factors are fluid, a plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them." *Id*. (internal quotations and citation omitted). Here, virtually all of the factors weigh heavily in favor of likely confusion.

*(1) The ASU Marks and Maroon and Gold School Color Trade Dress are strong*

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Brookfield,* 174 F.3d at 1058. By virtue of ASU's longstanding and widespread use and substantial promotion of the ASU Marks and color trade dress, and their widespread exposure and impact on the community, the ASU Marks and trade dress are strong. (Ver. Comp., ¶¶ 11-22)

*(2) Proximity and relatednesss of the goods*

The proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 350 (9th Cir. 1979), *abrogated on other grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003). "Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Brookfield,* 174 F.3d at 1055. The "asu_covid.parties" account owner promoted a "Hoax-19" party to ASU students that it claimed would be taking place in Tempe, Arizona, which is also the location of ASU's largest campus, at the very time that students were returning to campus. ASU routinely holds events for its students as part of its educational mission, including social events to welcome students back to campus. Accordingly, this factor weighs in favor of finding a likelihood of confusion.

*(3) Similarity of the marks*

"[T]he more similar the marks in terms of appearance, sound, and meaning, the greater the likelihood of confusion." *Brookfield,* 174 F.3d at 1054. The account owner is using the ASU mark in its username ("asu_covid.parties") and profile ("ASU Covid Parties") and has repeatedly used the ARIZONA STATE UNIVERSITY mark as its profile name in connection with multiple posts on its Instagram account, and also incorporated ASU's trade dress into certain of the Instagram posts. Because Defendant used ASU's exact marks and trade dress, confusion is more likely.

*(4) Marketing channels*

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft,* 599 F.2d at 353. Here, the defendant's only marketing channel is Instagram. ASU operates its official Instagram account with the username "arizonastateuniversity" that also prominently features the ASU mark. The marketing channels therefore overlap, which increases the likelihood of confusion. A casual user, upon seeing the "asu_covid.parties" username on an Instagram post is likely to assume it is somehow associated with ASU. This is especially so where Defendant also included the Arizona State University name and mark as part of its profile name in certain posts.

*(5) Evidence of Actual Confusion*

Although evidence of actual confusion is not required, where such evidence exists, it is persuasive proof of a likelihood of confusion. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1208 (9th Cir. 2000). Here, an alumnus threatened to surrender his membership because of his mistaken belief that ASU was promoting covid parties. (Ver. Comp., ¶ 31) Thus, this factor weighs in favor of a likelihood of confusion.

*(6) Defendant's Intent*

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft,* 599 F.2d at 354. It is clear from the very first post on the "asu_covid.parties" Instagram account, that the owner used the ASU Marks intentionally to benefit from the goodwill associated with those marks. The July 19, 2020 post was created to give every appearance of a genuine post from ASU, including the use of the ARIZONA STATE UNIVERSITY mark, an ASU logo, and the maroon and gold school colors trade dress.

Weighing all the relevant factors, the Court should conclude that Defendant's conduct as alleged in the Verified Complaint created a likelihood of confusion and that ASU is entitled to judgment on its infringement and false designation of origin claims under 15 U.S.C. §§ 1114 and 1125(a)(1)(A), as well as its state law claim for unfair competition.

Furthermore, even if a consumer were to conclude, after reading one or more posts by "asu_covid.parties" that the account may not be affiliated with ASU, there is nevertheless actionable initial interest confusion in the sense that "asu_covid.parties" improperly benefits in the first instance by using the goodwill developed in the ASU Marks to drive consumers to its account. *See Brookfield*, 174 F.3d at 1062.

For these reasons, the Court should enter default judgment against Defendant on Counts One, Two, and Five of ASU's Verified Complaint.

B    Count Two - False Advertising

1  To prevail on its claim under 15 U.S.C. §1125(a)(1)(B), ASU must prove (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

On July 29, Defendant posted an ad for its "Hoax-19" party falsely asserting a partnership between ASU or an ASU related entity and an Israeli company identified in the comments as Teva Pharmaceuticals to use profits from the party to distribute hydrochloroquine, a highly controversial drug. (Ver. Comp., ¶ 27). Other posts assert this party will be hosted at a consulate in Tempe and registered with the City as a protest, which claims are believed to be false. (Ver. Comp. Exhibit 2). These statements have the tendency to deceive and would be material to persons wanting to attend such a party without incurring potential discipline and/or who believe distributing hydrochloroquine had merit. If allowed to resume and continue, ASU is likely to be injured by these false statements by the negative impact the "Hoax-19" party would likely have on the goodwill associated with the ASU Marks.

C.     Count Four - Arizona Trademark Dilution

To prevail on its state law claim for trademark dilution, ASU must prove that (1) the ASU Marks are famous in Arizona; (2) the defendant has engaged in the commercial use of the marks; (3) the defendant's use began after the ASU Marks became famous in Arizona; (4) and the defendant's use of the marks is likely to cause dilution by blurring or dilution by tarnishment. *See* A.R.S. 44-1448.01; *Moab Indus., LLC v. FCA US, LLC* 2016 WL 5859700, at *8 (D. Ariz. Oct. 6, 2016). A finding of likely confusion by consumers is not required.

The evidence of the longstanding and widespread use of the ASU Marks and trade dress

13

by ASU demonstrates those marks are famous in Arizona and became famous before Defendant created the "asu_covid.parties" Instagram account in July of 2020. In promoting COVID parties, from which the defendant claimed profits would be generated, while otherwise disparaging ASU and its officials, the defendant engaged in a commercial use of the ASU Marks that is likely to dilute and tarnish the goodwill associated with the ASU Marks and trade dress.

For the foregoing reasons, and based upon the relevant facts alleged in ASU's Verified Complaint, which must be taken as true, ASU has demonstrated both that the Verified Complaint has sufficiently pleaded the claims and that ASU is entitled to judgment on the merits of those claims. Accordingly, *Eitel* factors 2 and 3 favor the entry of a default judgment on all counts.

3. *Eitel* Factor 4 – Money at Stake

The fourth factor, the sum of money at stake, also favors a default judgment. Where, as here, the plaintiff foregoes its claim for monetary damages and seeks only injunctive relief, the fourth factor weighs in favor of a default judgment. *See Trident Inv. Partners Inc. v. Evans*, 2021 WL 75826, at *3 (D. Ariz. Jan. 8, 2021) (injunctive relief is an appropriate remedy and weighs in favor of a default judgment); *Am. Auto. Ass'n, Inc. v. Lopez*, 2017 WL 2905999, *4 (C.D. Cal. 2017) ("Plaintiff has decided to forgo its claims for damages and instead seeks a permanent injunction. A permanent injunction with no money damages is reasonably proportionate to the harm caused by Defendant's actions. Accordingly, this factor weighs in favor of entering default judgment.")

4. *Eitel* Factor 5 – Possibility of Disputed Material Facts

The fifth *Eitel* factor is easily addressed and also weighs in favor of a default judgment here. "Because all allegations in a well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no likelihood that any genuine issue of material fact exists." *Elektra Ent. Grp. Inc. v. Crawford*, 226 F.R.D. 388, 393 (C.D. Cal. 2005). Indeed, even in Defendant's now stricken answer, Defendant readily admitted the creation of the Instagram accounts and messages that gave rise to this lawsuit. See Doc# 13.

1   Accordingly, the fifth factor weighs in favor of a default judgment.

2        5.  *Eitel* Factor 6 – Default was not the Product of Excusable Neglect

3        There can also be no doubt that Defendant's default was intentional and not the product of excusable neglect.  Defendant was clearly apprised of the pendency of the case, as evidenced by the prior filings (Doc# 13-15).  Defendant provided an e-mail address (pba-hater@protonmail.com), filed a request for electronic noticing at this e-mail address (Doc# 14), and expressly agreed that "Documents may be served via e-mail."  Doc#13, p. 10.  Defendant also filed a motion for permission to file documents electronically without an attorney in which Defendant expressly represented, "I have used ECF filing many, many times before and know how it works."  Doc# 15, p. 2.  Thus, there can be no doubt that Defendant received the Court's Order (Doc# 16) requiring Defendant to file an appropriate amended answer.  Defendant's subsequent e-mail correspondence with Plaintiff's counsel regarding the subpoena served on Facebook further demonstrates that Defendant has been following the proceedings.  See Doc# 27-1, Exhibit A.  Accordingly, default was not the product of excusable neglect, and the sixth *Eitel* factor weighs in favor of default judgment.

     6.  *Eitel* Factor 7 – The policy in favor of decisions on the merits

     Although the seventh factor generally weighs against default judgment, that factor standing alone does not preclude entry of a default judgment.  *See Trident Inv. Partners Inc.*, 2021 WL 75826, at *3 ("Defendants who appear to be 'blowing off' the complaint should expect neither sympathy nor leniency from the court.") (quoting 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 55, at 119-20 (2020) (footnote omitted).

     As shown above, the *Eitel* factors weigh in favor of a default judgment.

**C.    ASU is entitled to a permanent injunction.**

     15 U.S.C § 1116(a) authorizes the Court to enter a permanent injunction as a remedy "to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a) . . . of section 1125 of this

title." To be entitled to a permanent injunction, ASU must show (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *eBay, Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006).

　　　*(1)  ASU has been irreparably harmed.*

　　"A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction." 15 U.S.C. § 1116(a).  This presumption of irreparable harm was codified in the Trademark Modernization Act of 2020.  *See* Pub.L. 116-260, Div. Q, Title II, § 226(a), Dec. 27, 2020, 134 Stat. 2208.  In addition to this presumption, the uncontroverted allegations in the Verified Complaint demonstrate irreparable harm because Defendant's unauthorized use of the ASU Marks deprives ASU of the control over its goodwill and reputation.  "The loss of control over one's trademarks, reputation, and goodwill is 'a quintessentially irreparable injury.'"  *Vineyard House, LLC v. Constellation Brands U.S. Operations, Inc.*, 2021 WL 254448, at *14 (N.D. Cal. Jan. 26, 2021) (citations omitted); *see also McCarthy on Trademarks and Unfair Competition*, Fifth Edition § 30:47.70 ("Like trying to un-ring a bell, trying to 'compensate' after the fact for damage to business goodwill and reputation cannot constitute a just or full compensation.")

　　　*(2) Legal remedies are inadequate.*

　　Injunctions are "the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's ongoing infringement." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988).  Defendant has shown their willingness to continue infringing.  For example, as soon a Facebook had removed the original asu_covid.parties account, Defendant created and

posted asu_covid.parties2 (*See* Exhibit A hereto) and has boasted in correspondence with undersigned counsel that when "one [account] gets banned, yet more pop up." See Doc# 27-1, Exhibit A.  An injunction is warranted to prevent Defendant from creating more accounts.

Furthermore, because Defendant's identity and location are unknown, it would be likely impossible for ASU to recover any monetary damages, which also demonstrates that a legal remedy would be inadequate.  *See Chen Lunxi,* 2020 WL 2026333 at *7.

*(3) The Balance of Hardships Tip Strongly in ASU's Favor*

Defendant will suffer no hardship because the entry of the requested permanent injunction will only force Defendant to comply with the trademark laws.  In contrast, the denial of an injunction would deprive ASU of the ability to control its goodwill and reputation associated with the ASU Marks and would permit Defendant to continue to usurp that goodwill for their own purposes.  *See Trident Inv. Partners Inc.,* 2021 WL 75826, at *7.  Having established Defendant's liability, ASU should not be left without any remedy.

*(4) An injunction will not disserve the public interest.*

Finally, a permanent injunction will not disserve the public interest.  To the contrary, it promotes the public interest by preventing confusion and allowing ASU to reap and protect the benefits of its substantial investment in the ASU Marks.  *See Id.*  "The 'public interest favors elimination of consumer confusion' caused by trademark infringement." *TMC Franchise Corp. v. Millennium Vision, LLC*, 2011 U.S. Dist. LEXIS 3849, *4 (D. Ariz. January 6, 2011).

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully asks the Court to enter the default judgment against Defendant and permanently enjoin Defendant from further use of the ASU Marks in their social media account names and to promote parties, goods or other services, as set forth in the proposed permanent injunction submitted herewith.

RESPECTFULLY SUBMITTED this 28th day of April 2021.

By /s/Sean Garrison
**Glenn S. Bacal** (AZ Bar No. 006812)
E-mail: glenn.bacal@bacalgroup.com
**Sean D. Garrison** (AZ Bar No. 014436)
E-mail: sean.garrison@bacalgroup.com
Direct Dial: 480-719-8501
**BACAL LAW GROUP, P.C., DBA
BACAL & GARRISON LAW GROUP**
6991 East Camelback Road, Suite D-102
Scottsdale, Arizona 85251
Fax: (480) 245-6231

*Attorneys for Plaintiff Arizona Board of Regents, for and on behalf of Arizona State University*

## CERTIFICATE OF FILING AND SERVICE

I certify that on April 28, 2021, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to the John Doe defendant at pba-hater@protonmail.com.

/Sean D. Garrison/
Sean D. Garrison

# EXHIBIT A

