**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Board of Regents, | No. CV-20-01638-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| John Doe, | |
| Defendant. | |

This is an unusual case.  On one side is a major public university that seeks to use our nation's trademark laws in novel ways in an effort to combat the COVID-19 pandemic. On the other side is a deeply unsympathetic John Doe defendant ("Doe") who posted a series of vulgarity-filled messages on Instagram in an attempt to persuade college students to attend maskless COVID-19 parties during the peak of the first wave of the pandemic, whose answer was stricken for litigation misconduct, who stopped participating in this action after his answer was stricken, and whose identify was never discovered during subsequent proceedings.  All of this has culminated in the plaintiff, the Arizona Board of Regents ("ABOR"), filing a motion for default judgment that seeks the entry of a permanent injunction against Doe.  (Doc. 33.)  As discussed below, although ABOR's motivations for bringing this lawsuit are understandable, ABOR has not established that Doe's challenged conduct (however odious it may be) implicates the trademark doctrines identified in ABOR's complaint.  Accordingly, ABOR's motion is denied and this action is dismissed.

**BACKGROUND**

I.      Underlying Factual Allegations

The facts set forth below are derived from ABOR's complaint.  (Doc. 1.)  Because Doe has defaulted, ABOR's alleged facts are assumed true, except facts as to damages. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977).

A.      **ASU's Marks, Trade Dress, And Instagram Account**

Arizona State University ("ASU"), which was founded under a different name in 1885, has continuously operated under the "ASU" and "ARIZONA STATE UNIVERSITY" trademarks since 1958.  (Doc. 1 ¶ 9.)  ASU owns "numerous ASU, ARIZONA STATE UNIVERSITY, and ARIZONA STATE federal trademark registrations for a variety of different goods and services."  (*Id.* ¶ 10.)

ASU also owns "the ASU school colors trade dress, consisting of maroon and gold, which it has been using since at least as early as 1898."  (*Id.* ¶ 11.)  "ASU's maroon and gold color scheme has been used extensively on merchandise, in advertising and promotional materials, and on ASU's website and social media accounts to designate ASU and its goods and services, such that consumers—especially Arizona consumers—readily recognize maroon and gold as representing ASU."  (*Id.*)  ASU "invests substantial sums annually" to achieve "wide and extensive exposure of the ASU Marks and maroon and gold trade dress to the public in direct association with the University."  (*Id.* ¶ 12.)

ASU also operates an official Instagram account with the username "arizonastateuniversity."  (*Id.*)  The account "prominently features the ASU Marks and school colors trade dress."  (*Id.*)

B.      **Doe's Instagram Posts**

On or about July 19, 2020, Doe (whose true identity and location are unknown) created an Instagram account under the username "asu_covid.parties."  (*Id.* ¶ 23.)  Directly below the username, Doe identified his location as "Arizona State University."  (*Id.*)  In the profile associated with this account, Doe identified his full name as "ASU Coronavirus Parties," identified his title as "Event Planner," and then provided the following blurb:

1  "'COVID-19 Parties because they're during this pandemic era' Not a contest to catch

2  COVID.  THROWING HUGE PARTIES AT ASU.  Follow before we go private."  (*Id.* ¶

3  24.)

4        Also on July 19, 2020, Doe posted the first message on the "asu_covid.parties"

5  account.  (*Id.* ¶ 23.)  It provided as follows:



18  (*Id.*)  As the complaint notes, this post included "the ASU logo within the body of the

19  message" and was formatted "in ASU's maroon and gold color trade dress."  (*Id.*)

20        At some unspecified time after he created this post, Doe wrote a comment in the

21  public comment bar that appears next to the post.  (*Id.*)  The comment provided as follows:

22  "Those of you coming back to Phoenix.  We about to get fucking lit."  (*Id.*)

23        On July 20, 2020, Doe posted his second message on the "asu_covid.parties"

24  account.  (*Id.* ¶ 25.)  Unlike the first message, this message was not formatted in maroon

25  and gold (it was set against a black background, with neon pink and yellow text) and did

26  not include the ASU logo.  (*Id.*)  Its text provided as follows: "OUR FIRST PARTY WILL

27  BE CALLED HOAX-19 BECAUSE THE IDEA THAT COVID IS ONLY RAMPANT

28  IN AMERICA COMPARED TO OTHER COUNTRIES IS A HOAX!   COME TO

HOAX-19.  POSTING ADDY SOON!"  (*Id.*)

Doe proceeded to post a series of additional messages on the "asu_covid.parties" account.  (Doc. 1-4 at 2-21.)  Although the complaint only discusses some of those messages, more are provided in an attachment to the complaint.  (*Id.*)  Notably, none of the later messages prominently featured the colors of maroon and gold and only one displayed the ASU logo.  (*Id.*)  The text of each subsequent message[1] is as follows:

▪ <u>Message Three</u>:  "I just spoke to the Vice-Consul of the Consulate of the Republic of Belarus.  The consul couldn't make it so I only spoke with the Vice Consul in person.  They are both excited to host us.  They are both awesome accomplished guys.  We would like to thank them for letting us throw a party on consulate grounds so the party can't get shut down by the police.  The party will take place on the first Saturday of the semester."  (Doc. 1-4 at 2, 5.)

▪ <u>Message Four</u>:  "For security purposes, the consulate has asked us to prohibit masks so we can identify people.  Also the drinking age in Belarus is 18 [emoji of Belorussian flag] since we will be on Belarus soil while in the consulate."  (Doc. 1-4 at 2, 6.)

▪ <u>Message Five</u>:  "We will party.  We do not care what you snowflakes say.  COVID-19 is a fat hoax."  (Doc. 1 ¶ 26; Doc. 1-4 at 2, 7.)

▪ <u>Message Six</u>:  In the sixth message, in lieu of drafting his own text, Doe provided what appears to be a picture of an article from a newspaper entitled *The State Press*.  (Doc. 1-4 at 2, 8.)  The headline of the article is "University plans to punish partying on and off campus."  (*Id.*)  The text of the article begins (before being cut off): "In response to questions about an Instagram page promoting 'COVID parties,' the University said it will not tolerate behavior that disregards health protocols."  (*Id.*)  In a lengthy comment appearing next to this post, Doe wrote the following:

---

[1]    The Court has used ellipses in place of some of the more offensive language appearing in certain posts.  The quoted language is sufficient for purposes of the likelihood-of-confusion analysis appearing later in this order and there is no need to place undue emphasis on the bile being spewed by an anonymous internet provocateur such as Doe.

They are trying to slander this account.  They don't report the threats people have made to purposely come to the party with COVID . . . .  I gave a fake consulate so there is no political backlash for said country.  Our company will not name the consulate our party will be at.  Just the address when the time comes.  CDC Guidelines, Arizona jurisdiction and ASU on campus rules do not apply to foreign soil.  We will be violating nothing.  ASU will not be able to punish you.  There will be security at the party.  EXPRESS YOUR FREEDOM.  LET'S PARTY.  FIRST SATURDAY OF 2020 FALL SEMESTER.  (These parties are hosted for students to have fun like how a normal frat party would work.  These parties are not designed to disregard public health protocols because they will not be public.  These parties will be like parties if COVID never existed.  There will be a list where you can RSVP in advance)  Prohibiting masks is for the safety of everyone at parties.  We do not want people committing crimes because they feel empowered by anonymity.  We don't think COVID itself was a hoax.  We believe the idea that COVID was especially bad in the United States is a hoax. . . .  Our company has an excellent insurance policy.  Anything broken in the consulate will be replaced.  We will pay the medical bills of any of the Consulate staff who catch COVID-19 within 14 days of the party.  Partygoers, however, will have to sign a waiver before entry.  We will not release the names of people who sign waivers to the University under any circumstance.

(*Id.* at 8.)

• <u>Message Seven</u>:  This message included two different statements, set off from each other.  One provided: "For people telling me that I'm responsible for all the people who die from COVID at our parties.  That means the guy who ate a bat in Wuhan or the Chinese Government (however you think the virus started) has the greatest kill count of us all."  The other provided: "You're not pissed at those people?!"  (Doc. 1-4 at 2, 9.)

• <u>Message Eight</u>:  "ASU being a public institution that receives state funding cannot legally suspend students for off campus partying.  You are protected by the 1st Amendment of the constitution of the United States of America.  Your right to peaceably assemble is being violated by ASU."  (Doc. 1-4 at 2, 10-11.)

• <u>Message Nine</u>:  "As a CA in a dorm, I will not snitch on anyone who parties off campus or even has dorm parties.  It is not my job to get you in trouble.  It is my job to be there when you need me and to make sure college can be enjoyable for everyone.  I hope

other CAs can pledge to this at ASU." (Doc. 1-4 at 2, 12.)

▪ <u>Message Ten</u>: "Due to increasing concerns regarding security from the Consulate, please bring your school ID.  Undercover police are not allowed into a consulate without explicit permission under the Vienna Convention on Diplomatic Relations.  ASU Faculty are not allowed on the premises.  Only students.  The party has been registered as a protest with the city.  If ASU takes any action against the attendees, it is a 1st amendment violation." (Doc. 1-4 at 2, 13.)

▪ <u>Message Eleven</u>:  "We have partnered with an Israeli company to distribute hydrochloroquine! All Profits of the party will go to helping people in other countries get hydrochloroquine to treat COVID-19!" (Doc. 1 ¶ 27; Doc. 1-4 at 2, 14.)  Doe also wrote the following comment in the public comment bar that appears next to this post: "Thank you to our friends from Israel!  We have partnered with Teva Pharmaceutical." (*Id.*)

▪ <u>Message Twelve</u>:  "Reminder: No masks allowed at parties for security reasons. We have received several threats.  If you wear a mask, you will be removed from party." (Doc. 1 ¶ 28; Doc. 1-4 at 2, 15.)

▪ <u>Message Thirteen</u>:  "If there's enough problems enforcing the mask mandate on ASU campus, the campus will give in and rescind the idiotic policy of thinking it's healthy to block your oxygen.  If you repost this and send us a dm, we will offer you free drinks at the party." (Doc. 1-4 at 2, 16.)  Doe also wrote the following comment in the public comment bar that appears next to this post: "Be as brave as the huge anti-mask protests in Germany this week.  Stand up for your freedom and don't wear a mask.  It is not the university's job to baby you.  It is their job to teach you and let you become your own person.  Do not let them control you.  Millions of people around the world are with you standing up to tyranny.  Do not let the University intimidate you.  ASU wants you to wear a mask outside even and even while you workout.  They do not care if you pass out while working out.  How ridiculous for them to act like they care about your health.  Stand up for your right to choose." (*Id.*)

▪ <u>Message Fourteen</u>:  "Who[']s ready for the moshpit!!!" (Doc. 1-4 at 2, 17.)

▪ <u>Message Fifteen</u>:  "Arizona State University cannot legally coerce you into testing against your will!"  (Doc. 1-4 at 2, 18.)  Doe also wrote the following comment in the public comment bar that appears next to this post:  "This is ASU, not the USSR, Nazi Germany, North Korea, China or Venezuela, etc.  Do not let Führer Crow force you to wear a mask or test.  They will use false positives to push their agenda to control you.  The administration is filled with rich power hungry corrupt fascists."  (*Id.*)

▪ <u>Message Sixteen</u>:  "GOOD NEWS!  We won the battle in court and we're back!  We want to thank everyone who supported us and all of the ASU students and alumni who donated to our legal defence [sic] fund!  Because of you, ASU now not only has to cover our legal fees but they also have to pay out $500,000 to cover our sponsorship losses.  We expect to have the money in 2 weeks.  See you all back on campus and let's party!"  (Doc. 1 ¶ 33; Doc. 1-4 at 2, 19.)  Additionally, in the margins surrounding this text, Doe included the hashtags "#GoSunDevils," "#ASU," and "#GodBlessAmerica."  (*Id.*)[2]

▪ <u>Message Seventeen</u>:  In the seventeenth message, Doe posted what appears to be a screenshot of a posting that appeared on the official ASU Instagram page.  (Doc. 1-4 at 2, 20.)  The posting, which is entitled "Fall 2020 Daily Health Check," includes a picture of a student wearing a mask.  (*Id.*)  The following text appears below the picture: "Starting August 17, @arizonastateuniversity students and employees will need to submit a daily health check to reduce the spread of #COVID19 and promote well-being among our #SunDevil community."  (*Id.*)  In a comment written directly below this screenshot, Doe wrote: "Führer Crow [swastika symbol] wants to track you with an app even when you're off campus.  Don't download it."  (*Id.*)  And in a comment appearing next to this post, Doe wrote the following: "And this isn't too much?  The app uses location services and your IP Address to track you.  This app should be banned like TikTok."  (*Id.*)

▪ <u>Message Eighteen</u>:  "'Tell us your symptoms every single day.  Let us track your location for your safety.  Wear a mask.  Don't get too close to your friends.  No visitors in your dorm room. . . .  No parties.  No sports.  No going outside without a mask.  No

---

[2]     The claims in Message Sixteen about a lawsuit against ASU were false.  (Doc. 1 ¶¶ 33-34 ["No such lawsuit or claim or judgment for damages exists."].)

hugging.  No concerts.  No international travel without quarantining before coming to campus.  No working out without a mask even though that's more likely to hurt you than the chance of catching COVID-19.  No frat parties.  No Trump rallies but protesting BLM is okay.  No singing in church.  No clubbing.'  Fuck Führer Crow.  We are going to party . . . ."  (Doc. 1-4 at 2, 21.)

▪ Message Nineteen:  "Masks and restrictions don't work.  New Zealand has had cases for weeks without knowing it."  (Doc. 1 ¶ 28.)

C.    **The Single Alumni Complaint**

On July 24, 2020, a Twitter user who goes by the name "teach0r" posted the following message on Twitter: "#ASU having COVID parties and claiming it's a hoax?  I am stopping my alumni me,bees hip [sic] and removing my alumni sticker from my car and sending back my ASU alumni plate.  I am embarrassed to be associated with thus [sic] ignorant behavior."  (Doc. 1 ¶ 31.)

D.    **ASU's Unsuccessful Takedown Requests To Instagram**

On August 12, 2020, ASU's outside counsel submitted a trademark infringement report to Instagram concerning the "asu_covid.parties" account.  (Doc. 1 ¶ 41; Doc. 1-7 [actual report].)

On August 14, 2020, "Instagram responded that 'the reported party appears to be using your trademark to refer to or comment on your goods and services' and that it would not take any action regarding this account."  (Doc. 1 ¶ 42.)

On August 17, 2020, following an exchange of additional communications with ASU's outside counsel, Instagram again stated that "it would not act on the report to remove or modify any aspect of the 'asu_covid.parties' account."  (*Id.* ¶¶ 43-44.)

II.    Relevant Procedural History

On August 20, 2020, ABOR initiated this action by filing the complaint.  (Doc. 1.) The complaint named two defendants: (1) Doe and (2) Facebook Inc. ("Facebook), which is the parent of Instagram.  (*Id.*)

That same day, ABOR filed a motion for a temporary restraining order ("TRO").

(Doc. 2.)  However, after Facebook agreed to disable the "asu_covid.parties" account and prevent the accountholder from creating new accounts, ABOR withdrew its TRO request and agreed to dismiss Facebook as a defendant.  (Docs. 11, 20.)

On August 24, 2020, an individual claiming to be Doe filed an answer to the complaint.  (Doc. 13.)  Because this pleading was "filled with obscenities, inflammatory language, and insults directed toward ABOR and its counsel," the Court struck it.  (Doc. 16.)  The Court set a deadline of September 4, 2020 for Doe to "file an amended answer sans profanity and ad hominem attacks" and further stated that, if Doe wished to proceed under a pseudonym, he would need to file a reasoned motion justifying that request.  (*Id.*)

The September 4, 2020 deadline expired without any additional filings from Doe.  In fact, Doe has not done anything to participate in this case since submitting his filings on August 24, 2020.

On September 18, 2020, ABOR filed a motion for permission to conduct discovery before the Rule 26(f) conference in an effort to ascertain Doe's true identity.  (Doc. 21.)  This motion was granted.  (Doc. 23.)

On November 6, 2020, ABOR moved for entry of default against Doe.  (Doc. 25.)  Initially, this request was denied without prejudice, with the instruction that ABOR provide additional support concerning the propriety of entering a default against Doe under the circumstances.  (Doc. 26.)  After ABOR provided such support (Doc. 29), its renewed request for entry of default against Doe was granted (Docs. 30, 31).

On April 28, 2021, ABOR filed the pending motion for default judgment.  (Doc. 33.)

## ANALYSIS

The "decision whether to enter a default judgment is a discretionary one."  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).  The following factors, known as the *Eitel* factors, may be considered when deciding whether default judgment is appropriate: (1) the possibility of prejudice to the plaintiff, (2) the merits of the claims, (3) the sufficiency of the complaint, (4) the amount of money at stake, (5) the possibility of factual disputes, (6)

whether the default was due to excusable neglect, and (7) the policy favoring decisions on the merits.  *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

"[T]he general rule" for default judgment purposes "is that well-pled allegations in the complaint regarding liability are deemed true."  *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).  "The district court is not required to make detailed findings of fact."  *Id.*  "However, necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default."  *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992), *superseded by statute on other grounds as recognized in United States v. Lozano*, 2020 WL 905676, *3 (S.D. Cal. 2020).

I.      The First *Eitel* Factor—Prejudice To Plaintiff

The first factor weighs in favor of default judgment.  Prejudice to ABOR is obvious—if the motion for default judgment were denied, ABOR would be without other recourse.  *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) ("If Plaintiffs' motion for default judgment is not granted, Plaintiffs will likely be without other recourse for recovery.").

II.     The Fifth And Sixth *Eitel* Factors—Factual Disputes And Excusable Neglect

The fifth and sixth factors also weigh in favor of default judgment.  Doe initially participated in this litigation, going so far as to avow that "I have used ECF filing many, many times before and know how it works" (Doc. 15 at 2), only to stop participating after his answer was stricken due to litigation misconduct.  *Braunlich v. Arizona Rd. Trip Auto LLC*, 2020 WL 4921971, *2 (D. Ariz. 2020) ("Due to Defendants' failure to participate, there is no dispute over material facts and no indication that default is due to excusable neglect.").

III.    The Seventh *Eitel* Factor—Policy Favoring A Decision On The Merits

The seventh factor usually weighs against default judgment, given that cases "should be decided upon their merits whenever reasonably possible."  *Eitel*, 782 F.2d at 1472.  However, the existence of Rule 55(b) of the Federal Rules of Civil Procedure, which authorizes default judgments, "indicates that this preference, standing alone, is not

dispositive." *PepsiCo*, 238 F. Supp. 2d at 1177 (internal quotation marks omitted). Put simply, "the default mechanism is necessary to deal with wholly unresponsive parties who otherwise could cause the justice system to grind to a halt. Defendants who appear to be 'blowing off' the complaint should expect neither sympathy nor leniency from the court." 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 55, at 123-24 (2021) (footnote omitted).

IV.   The Fourth *Eitel* Factor—The Amount Of Money At Stake

Although ABOR included a request for monetary damages in the complaint (Doc. 1 at 22), ABOR clarifies in its motion for default judgment that it is only seeking the entry of a permanent injunction against Doe (Doc. 33 at 1). This favors granting default judgment. *PepsiCo, Inc.*, 238 F. Supp. 2d at 1176-77 ("In the instant case, Plaintiffs are not seeking monetary damages. They seek only injunctive relief . . . . [so] this factor favors granting default judgment.").

V.   The Second And Third *Eitel* Factors—Merits And Sufficiency

That leaves the second and third *Eitel* factors—the merits of the claim and the sufficiency of the complaint. "These two factors are often analyzed together and require courts to consider whether a plaintiff has state[d] a claim on which [it] may recover." *Vietnam Reform Party v. Viet Tan-Vietnam Reform Party*, 416 F. Supp. 3d 948, 962 (N.D. Cal. 2019) (alterations in original) (internal quotation marks omitted). "Of all the *Eitel* factors, courts often consider the second and third factors to be the most important." *Id.*

A.   **Counts One, Two, And Five**

The Court will address ABOR's claims in Counts One, Two, and Five at the same time because ABOR follows the same approach in its motion. (Doc. 33 at 9-13.)

Count One is a claim for trademark infringement under 15 U.S.C. § 1114. (Doc. 1 ¶¶ 46-52.) The theory underlying this claim is that Doe engaged in the unauthorized use of "the ASU Marks" when creating posts and messages on the "asu_covid.parties" account concerning the "'Hoax-19' covid party" and, in doing so, "likely . . . cause[d] confusion as to ASU's affiliation, endorsement, and/or sponsorship of the event." (*Id.*)

1    Count Two is a claim for false designation of origin and false advertising under 15

2    U.S.C. § 1125.  (*Id.* ¶¶ 53-57.)  Here, the theory is that Doe engaged in the unauthorized

3    use "of the ASU Marks, school colors trade dress, and other false or misleading

4    descriptions and/or representations of fact" when creating posts and messages on the

5    "asu_covid.parties" and, in doing so, "likely . . . cause[d] confusion, . . . mistake, or

6    [deception] as to the affiliation, connection, or association of the 'asu_covid.parties'

7    account with ASU, or as to the origin, sponsorship, or approval of the Hoax-19 party event

8    and related messaging by ASU."  (*Id.*)

9    Count Five is a state-law claim for unfair competition.  (*Id.* ¶¶ 71-74.)  Here, ABOR

10    simply incorporates by reference all of its earlier allegations and asserts that Doe's actions

11    also "constitute unfair competition under Arizona law."  (*Id.*)

12    As ABOR correctly acknowledges (Doc. 33 at 9-10), all three of these claims

13    require a showing of a likelihood of confusion (or some variant thereof).  *Wells Fargo &*

14    *Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072 (9th Cir. 2014) (claim for Lanham

15    Act false advertising requires a showing that "the statement actually deceived or has the

16    tendency to deceive a substantial segment of its audience," while claim for trademark

17    infringement requires a showing of "a likelihood of confusion through the balancing of

18    eight factors"); *IOW, LLC v. Breus*, 425 F. Supp. 3d 1175, 1195 (D. Ariz. 2019)

19    ("Arizona's common law doctrine of unfair competition encompasses the related claims of

20    trademark infringement, false advertising, palming off, and misappropriation.   Under

21    Arizona law, the ultimate question for unfair competition is always whether trade is being

22    unfairly diverted, and whether the public is being cheated into the purchase of something

23    which it is not in fact getting; the courts interfere solely to prevent deception.") (citations

24    and internal quotation marks omitted).  "The 'likelihood of confusion' inquiry," in turn,

25    "generally considers whether a reasonably prudent consumer in the marketplace is likely

26    to be confused as to the origin or source of the goods or services bearing one of the marks

27    or names at issue in the case." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190,

28

1209 (9th Cir. 2012) (citation omitted).[3]

Here, a reasonably prudent consumer would not be deceived or confused into believing that ASU was the "source or origin" of the posts and messages emanating from the "asu_covid.parties" account. Only one of the 19 posts (the first post) featured both ASU's distinctive maroon and gold colors and ASU's logo. (Doc. 1-4 at 3.) The post itself only contained the words "No more social distancing. No more masks. It is time to party!" (*Id.*) However, the "surrounding context on the user's screen" is "important here." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1154 (9th Cir. 2011). Anyone viewing this post online would immediately see the string of comments accompanying the post. The "asu_covid.parties" accountholder posted the first two comments in the thread, the second of which was: "Those of you coming back to Phoenix. We about to get fucking lit." (Doc. 1-4 at 3.) Although it is not uncommon for universities to attempt to appeal to students by imitating their vernacular, no university would drop the f-bomb in an official party invitation. Also, the speaker ("we") plans "to get . . . lit," which, in context, clearly means "drunk." A reasonably prudent consumer would not have construed this as an invitation from ASU to come to an ASU-sponsored party.

Many of the subsequent messages from the "asu_covid.parties" account affirmatively criticized—often in profane and vulgar terms—ASU's leadership and official policies. For example, Message Six quoted from a newspaper article about ASU's opposition to COVID parties, then stated that "[t]hey"—which, in context, obviously means ASU—"are trying to slander this account," assured readers that "ASU will not be able to punish you" for attending a COVID party, and closed with the promise that "[w]e will not release the names of people who sign waivers to the University under any circumstance." (*Id.* at 8.) No reasonably prudent consumer would have thought the origin

_____

[3] Courts consider the following non-exhaustive "factors for guidance in assessing the likelihood of consumer confusion: (1) strength of the protected mark; (2) proximity and relatedness of the goods; (3) type of goods and the degree of consumer care; (4) similarity of the protected mark and the allegedly infringing mark; (5) marketing channel convergence; (6) evidence of actual consumer confusion; (7) defendant's intent in selecting the allegedly infringing mark; and (8) likelihood of product expansion." *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1125 (9th Cir. 2014).

or source of these statements was ASU.

Other messages followed the same pattern.  Message Eight stated that "[y]our right to peaceably assemble is being violated by ASU."  (*Id.* at 10-11.)  Message Ten stated that "[i]f ASU takes any action against the attendees, it is a 1st amendment violation."  (*Id.* at 13.)  And a comment from the accountholder on another post stated that "[i]f there's enough problems enforcing the mask mandate on ASU campus, the campus will give in and rescind the idiotic policy of thinking it's healthy to block your oxygen" before exhorting readers to "not let the University intimidate you."  (*Id.* at 16.)  The author of these messages is obviously a person opposed to ASU's policies, not ASU itself.

Notably, one of the messages made this point explicitly, stating that, "*[a]s a CA in a dorm*, I will not snitch on anyone who parties off campus or even has dorm parties." (Doc. 1-4 at 12.)  An ASU student would know that a "CA" on ASU's campus is a "community advisor"—a student who enforces the rules in a college dorm—and that the post was therefore written by a student, as opposed to being an official message sent on behalf of the university.

Then there are the Nazi analogies.  Message Fifteen compares ASU unfavorably to "the USSR, Nazi Germany, North Korea, China or Venezuela" and then refers to ASU's president, Michael Crow, as "Führer Crow."  Similarly, Message Seventeen warns readers that "Führer Crow . . . wants to track you with an app even when you're off campus."  And Message Eighteen again includes a reference to "Führer Crow," this time accompanied by a stream of vulgarities.  Many things can be said about these offensive and outrageous statements, but it is not plausible (to put it mildly) that a reasonably prudent consumer would believe ASU was the source or origin of them.

ABOR's arguments to the contrary are unavailing.  ABOR argues that, because it has provided evidence of actual confusion, this is "persuasive proof of a likelihood of confusion."  (Doc. 33 at 12.)  But the sole instance of confusion cited by ABOR is a typo-laden Twitter post from an unidentified individual who claimed to be an ASU graduate. Although the post called out "#ASU," it's not clear from the haphazardly worded tweet

whether this individual was actually confused (*e.g.*, believed ASU was sponsoring COVID parties) or simply disgusted that ASU *students* were sponsoring COVID parties.  The threatened actions (revoking alumni membership and sending back an alumni plate) might have been motivated by a desire not to be associated with such students.  At any rate, even assuming that one out of the "nearly 500,000 Sun Devils worldwide"[4]—that is, 0.00000002% of the alumni base—believed that the profanity-laden posts coming from the "asu_covid.parties" account were actually coming from ASU, this would not establish a likelihood of confusion.  *Network Automation*, 638 F.3d at 1151 ("[A] showing of actual confusion among *significant numbers* of consumers provides strong support for the likelihood of confusion.")  (emphasis added).  Tellingly, the comments to the posts suggest that readers believed the "asu_covid.parties" account belonged to a student or group of students, not the university.  (*See, e.g.*, Doc. 1-4 at 3 ["Since none of you learned critical thinking skills, drop out.  [Y]ou don't deserve to be in college."]; Doc. 1-4 at 12 ["They gon switch us to all online by September bc of you DUMB mfs."]; Doc. 1-4 at 21 ["This is embarrassing.  I haven't even started at ASU yet and you're telling me I'm gonna have to go to school with idiots like you?  Bye."].)

Next, ABOR argues that the "Defendant's intent" factors cuts in its favor.  (Doc. 33 at 12.)  But Doe expressly identified himself as a community advisor (*i.e.,* student) and railed against ASU's administration and official policies.  It is not reasonable to view this course of conduct as an intentional plan to deceive the public into believing ASU was the source or origin of the messages coming from the "asu_covid.parties" account.

Finally, even accepting ABOR's contention that some of the remaining factors (such as the strength of the mark and similarity of marketing channels) could be viewed as supporting its claim, "the remaining *Sleekcraft* factors are unimportant" in a case, such as this one, where "no rational trier of fact could find that a reasonably prudent consumer . . . would likely be confused."  *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 940 (9th Cir. 2015).  *See also Network Automation*, 638 F.3d at 1145

---

[4]      *See* https://alumni.asu.edu/

("The *Sleekcraft* factors are intended as an adaptable proxy for consumer confusion, not a rote checklist."); *Eclipse Assoc. Ltd. v. Data Gen. Corp.,* 894 F.2d 1114, 1118 (9th Cir. 1990) ("These tests were not meant to be requirements or hoops that a district court need jump through to make the determination.").

In seeming anticipation of this conclusion, ABOR argues that "even if a consumer were to conclude, after reading one or more posts by 'asu_covid.parties' that the account may not be affiliated with ASU, there is nevertheless actionable initial interest confusion in the sense that 'asu_covid.parties' improperly benefits in the first instance by using the goodwill developed in the ASU Marks to drive consumers to its account." (Doc. 33 at 12.) Although it is true that "initial interest confusion" may qualify as infringement "even though no actual sale is finally completed as a result of the confusion," *Brookfield Comms., Inc. v. W. Coast Entertainment Corp.*, 174 F.3d 1036, 1062 (9th Cir. 1999), that doctrine is factually inapplicable here.  Admittedly, Doe's initial post on the "asu_covid.parties" account was written in maroon and gold and included a logo that potentially could be confused with ASU's logo, but as discussed above, the accompanying comment—"Those of you coming back to Phoenix.  We about to get fucking lit." (Doc. 1-4 at 3)—was too crude and profane to create initial confusion as to its source and origin.  More broadly, it cannot be the case that every social media post written by a college student that happens to use the school's colors and/or logo in the post, and identifies the school's location as the location of the poster, creates initial interest confusion and qualifies as an actionable trademark violation.

For these reasons, the second and third *Eitel* factors weigh against the entry of default judgment as to Counts One, Two, and Five.  This conclusion also cuts in favor of dismissing Counts One, Two, and Five at this juncture—because ABOR's factual allegations do not establish an entitlement to relief as to those claims, it would be pointless to deny the default judgment motion but then allow those claims to linger on the Court's docket.  *Cf. Singleton v. Dean*, 611 F. App'x 671 (11th Cir. 2015) (district court properly denied motion for default judgment, and then dismissed the complaint *sua sponte*, because

the factual allegations in the complaint were insufficient to establish a claim for copyright infringement). *See also Murray v. Cable Nat. Broad. Co.*, 86 F.3d 858, 860 (9th Cir. 1996) ("If the court determines as a matter of law from the pleadings that . . . confusion is unlikely, the complaint should be dismissed.").

B. **Count Four**

ABOR's remaining claim, in Count Four, is for trademark dilution under A.R.S. § 44-1448.01. "The elements necessary to prove a state law trademark dilution counterclaim are basically identical" to a federal trademark dilution claim. *Moab Indus., LLC v. FCA US, LLC*, 2016 WL 5859700, *8 (D. Ariz. 2016). A federal dilution claim, in turn, has the following elements: "(1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008).

"[T]he injury from dilution usually occurs when consumers *aren't* confused about the source of a product." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 903 (9th Cir. 2002). "Whereas trademark law targets 'interference with the source signaling function' of trademarks, dilution protects owners 'from an appropriation of or free riding on' the substantial investment that they have made in their marks." *Id.* Put another way, "[d]ilution . . . does not require a showing of consumer confusion." *Id.* at 905. As a result, the likelihood-of-confusion analysis set forth above is not controlling here.

Rather than conduct an independent analysis of the sufficiency of Count Four, the Court will decline to exercise jurisdiction over that claim. As ABOR acknowledges, subject matter jurisdiction arises in this action solely by virtue of ABOR's federal claims in Counts One and Two. (Doc. 1 ¶ 4.) ABOR does not invoke the diversity jurisdiction statute, 28 U.S.C. § 1332, likely because Doe's citizenship is unknown, and thus the Court only possesses supplemental jurisdiction over ABOR's state-law claims (including Count Four). (Doc. 1 ¶ 5.) Because all of ABOR's federal claims have now been dismissed, the

Court may decline to exercise such jurisdiction.  28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a [pendent state-law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction."); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").

VI.    Conclusion

Although some *Eitel* factors weigh in favor of granting a default judgment, other factors—including the most important factors—weigh against granting a default judgment as to Counts One, Two, and Five.  Accordingly, the Court denies ABOR's motion as to those claims and dismisses those claims for failure to state a claim.  And because there are no remaining federal claims in this action, the Court declines to exercise supplemental jurisdiction over ABOR's remaining state-law claim in Count Four.

Accordingly,

**IT IS ORDERED** that:

(1)    ABOR's motion for default judgment (Doc. 33) is **denied**.

(2)    Counts One, Two, and Five are dismissed for failure to state a claim and Count Four is dismissed for lack of jurisdiction.

(3)    The Clerk shall enter judgment accordingly and terminate this action.

Dated this 17th day of August, 2021.

Dominic W. Lanza
United States District Judge

- 18 -